**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>Maurice MCPHATTER | Crim. No. 18-578 (KM)<br><br>**OPINION & ORDER** |

**MCNULTY, District Judge**

The defendant, Maurice McPhatter, is serving a 10-year sentence for drug trafficking. He now moves for compassionate release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A), citing the COVID-19 pandemic and the danger to himself while incarcerated. (DE 190, supplemented at DE 209)[1] The United States has filed a response. (DE 214 (redacted); DE 215 (sealed and unredacted, with records attached)).

Mr. McPhatter has no risky medical condition, he has received a COVID vaccination and booster, infection rates are low at his institution, and the § 3553(a) factors weigh against release. The application will be denied.

I.     **BACKGROUND**

Mr. McPhatter was part of a drug trafficking organization headed by his codefendant, Ahmad Johnson. On October 10, 2019, he pled guilty to a one-count Superseding Information, which charged that from February through June, 2017, he conspired to distribute and possess with intent to distribute at least one kilogram of heroin and 28 grams of cocaine base. 21 U.S.C. 846. On May 15, 2020, this Court sentenced him to 120 months' imprisonment, the

---

[1]     Unless otherwise specified, "DE __" refers to docket entry numbers in this case. References in the form "G__" refer to pages in the records attached to the government's papers. (DE 215-1).

statutory mandatory minimum under 21 U.S.C. § 841(b)(1)(A). (DE 181; DE 183 (Sentencing Tr.) at 14).

Mr. McPhatter is currently serving that sentence at FCI Texarkana, in Texas. Assuming all possible good time credit, his estimated date of release is August 16, 2026.

## II. LEGAL STANDARDS

Once a term of imprisonment has been imposed, the Court may modify it only under very limited circumstances. *In re Morris*, 345 F. App'x 796, 797–98 (3d Cir. 2009) (citing 18 U.S.C. § 3582(c)). As relevant here, § 3582(c)(1) provides as follows:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--
>
>> (i) extraordinary and compelling reasons warrant such a reduction; [. . .]
>>
>> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See also United States v. Pawlowski*, 967 F.3d 327, 329–30 (3d Cir. 2020). The United States Sentencing Commission has promulgated a policy statement that, in relevant part, allows a court to grant compassionate release or a sentence reduction where: (i) extraordinary and compelling reasons warrant a reduction in a defendant's sentence; (ii) the defendant is not a danger to the

2

safety of others or to the community; and (iii) release from custody complies with the section 3553(a) factors, to the extent applicable. U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 1B1.13 (U.S. SENTENCING COMM'N 2018).

The Sentencing Commission issued a policy statement defining certain circumstances that qualify as extraordinary and compelling. U.S.S.G. § 1B1.13, Application Note 1(A)–(D).[2] That policy statement was enacted at a time when only the BOP could move for compassionate release, however, and has not been amended since the enactment of the First Step Act. In prior cases, I accepted the emerging near-consensus that where a defendant makes a motion under the First Step Act, the court is not bound by that application note. The U.S. Court of Appeals for the Third Circuit, in a precedential decision, has now joined that consensus:

> The first issue is whether the District Court was bound by the Commission's policy statement. We conclude that it was not.
>
> As the District Court noted, the text of the policy statement explicitly limits its application to Bureau-initiated motions. Thus, according to its plain language, the existing policy statement is not applicable—and not binding—for courts considering prisoner-initiated motions. In reaching this conclusion, we align with nearly every circuit court to consider the issue. *See United States v. Brooker*, 976 F.3d 228, 235 (2d Cir. 2020); *United States v. McCoy*, 981 F.3d 271, 282 (4th Cir. 2020); *United States v. Shkambi*, 993 F.3d 388, 393 (5th Cir. 2021); *United States v. Elias*, 984 F.3d 516,

---

[2] The application note lists three specific circumstances that qualify as extraordinary and compelling. Generally speaking, the enumerated circumstances include: (i) a terminal illness or a serious medical condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover; (ii) the defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less; or (iii) certain family circumstances exist where the defendant would be the only available caregiver for his or her minor child, spouse, or registered partner. U.S.S.G. § 1B1.13, Application Note 1(A)–(C). In addition, the Sentencing Commission included a catchall provision, which provides that "other reasons" may be sufficient if "[a]s determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in [the enumerated] subdivisions." *Id.*, Application Note 1(D).

> 519–20 (6th Cir. 2021); *United States v. Gunn*, 980 F.3d 1178, 1180–81 (7th Cir. 2020); *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021); *United States v. McGee*, 992 F.3d 1035, 1050 (10th Cir. 2021); *United States v. Long*, 997 F.3d 342, 355 (D.C. Cir. 2021). *But see United States v. Bryant*, 996 F.3d 1243, 1247–48 (11th Cir. 2021).

*United States v. Andrews*, 12 F.4th 255, 259 (3d Cir. 2021).

Thus the Guidelines policy statement does not limit what this Court, within its reasonable discretion, may find to be "extraordinary and compelling." Still, it remains a relevant and valuable guide, and is properly considered by a district court:

> The [district] court correctly recognized that although the policy statement is no longer binding, it still sheds light on the meaning of extraordinary and compelling reasons. "It is a commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law.'" *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, –– U.S. ––, 139 S. Ct. 1881, 1890, 204 L.Ed.2d 165 (2019) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013)). Because Congress reenacted the compassionate-release statute without any alterations to the phrase "extraordinary and compelling reasons," it was reasonable for the court to conclude that the phrase largely retained the meaning it had under the previous version of the statute. *See United States v. Johnman*, 948 F.3d 612, 619 (3d Cir. 2020) . . . .

*Andrews*, 12 F.4th at 260.

### III. ANALYSIS

#### A. Exhaustion of remedies

Before proceeding to the merits of a motion for compassionate release, a defendant must meet § 3582(c)(1)(A)'s exhaustion requirement, which requires either that that the defendant has exhausted all administrative remedies, or that, since the submission of a request to the warden, 30 days have passed without a decision being rendered. *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).

4

Mr. McPhatter states that on September 11, 2020, while still housed at Essex County Jail, he wrote to the Director of the Bureau of Prisons ("BOP") and the clerk of this Court, requesting compassionate release and explaining that he was unable to exhaust administrative remedies because he was not yet in a BOP institution. When ultimately designated to FCI Texarkana, he did not reapply to the BOP for relief there. Under the circumstances, however, I find that Mr. McPhatter made reasonable efforts to comply and that those efforts were frustrated by the time lag in designating him to a federal facility. I will leniently treat him as having substantially complied with the exhaustion requirement, and consider the merits of his application.

### B. Compassionate Release

#### 1. Extraordinary and compelling circumstances

Mr. McPhatter's First Step Act application for reduction of sentence is primarily based on the danger to his health from a COVID-19 infection while in the institutional setting of FCI Texarkana. My review of the petition and the records supplied to the Court yields the conclusion that there are no extraordinary and compelling circumstances here.

Logically, any assessment of extraordinary circumstances arising from the COVID-19 pandemic must include (a) the likelihood that a COVID infection would have severe consequences for this particular person, and (b) the more general danger of infection at the institution where the person is incarcerated.

Courts, including this one, have routinely looked to the Centers for Disease Control ("CDC") for guidance as to conditions that place a person at particular risk of serious consequences from a COVID-19 infection. *See People With Certain Medical Conditions*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated as of Dec. 14, 2021) (cited herein as "CDC List"). "Older adults," *i.e.,* those over age 65, are far more likely than young persons to suffer serious consequences, and account for some 80% of COVID deaths. *Id.* Certain listed medical conditions are also recognized as risk factors. These, in abbreviated form, are Cancer, Chronic kidney disease,

5

Chronic liver disease, Chronic lung disease (including "Asthma, if it's moderate to severe"), Dementia, Diabetes, Down syndrome, Heart conditions, HIV infection, Immunocompromised state, Mental health conditions, Overweight and obesity, Pregnancy, Sickle cell disease, Smoking, Solid organ or blood stem cell transplant, Stroke, Substance use disorders, and Tuberculosis. *Id.*

Mr. McPhatter is approximately 50 years old. He states, and prison medical records corroborate, that he has "calcification in area of left kidney"— *i.e.,* a kidney stone. (G 008) He states, and the court accepts, that sincew birth he has had only one kidney.[3] As of March 8, 2022, prison medical records identify the options as further observation or surgery to remove the kidney stone, and report that "Inmate does not want surgery." (G71) No other serious medical conditions are noted.

The CDC List does name "chronic kidney disease" as a COVID risk factor. *See supra.* Mr. McPhatter's medical records do not support such a diagnosis,[4] and he does not claim to have such a condition. What he does claim is a kidney stone.

Kidney stones do not rise to the level of "chronic kidney disease" listed as a risk factor by the CDC. For example, in *United States v. Leondi*, No. CR 17-527 (SDW), 2021 WL 717361, at (D.N.J. Feb. 23, 2021), the court observed that "kidney stones are not equivalent to chronic kidney disease, and the CDC does not suggest that the former condition increases the risk of severe illness from COVID-19." *Id.* at *3. Judge Wigenton denied release to 60-year old inmate who claimed "that his kidney stones, hypertension, weight, and gender made him more vulnerable to becoming seriously ill should he contract COVID-

---

[3] This is not specifically stated in the prison medical records, but the government points to corroborating references in the Presentence Report.

[4] A measure of kidney function is the eGFR (i.e., glomerular filtra ion rate). Prison medical records as of March 2021 report a raw eGFR of 57, with a note to multiply by 1.210 if the subject is African-American, which Mr. McPhatter is. That would yield a calculated eGFR score of 68.97. The same note states that a "calculated GFR <60 suggests a chronic kidney disease if found over a 3 month period." (G050).

6

19."). The government cites numerous cases to the same effect. (Gov't Brf. at 9–10) (citing *United States v. Gjeli*, Crim. No. 13-00421-1, 2020 WL 4432384, at *1 (E.D. Pa. July 31, 2020) (denying defendant's compassionate release because kidney stones are not an extraordinary and compelling reason for his release); *United States v. Mason*, Crim. No. 18-329, 2020 WL 4034835, at *2 (W.D. Pa. July 17, 2020) (denying compassionate release where defendant did not show that his kidney stones "substantially reduce[d] his ability to provide self-care in prison or significantly increase[d] his risk of major complications from COVID- 19"); *United States v. DeSciscio*, Crim. No. 88-239, 2020 WL 3893711, at *5 (D.N.J. July 10, 2020) (denying compassionate release for defendant with kidney stones, prostate cancer, atrial fibrillation, chronic rhinitis, and vertigo because defendant failed to show that these conditions 'substantially diminish[ed] [his] ability . . . to provide self-care within the environment of a correctional facility' (citing U.S.S.G. § 1B1.13 cmt. n.1(A)))).

Nor does the status of having only one kidney equate to a COVID risk recognized by the CDC. *See United States v. Cruz*, No. 2:17-CR-167-PPS, 2020 WL 5627448, at *2 (N.D. Ind. Sept. 21, 2020) ("having only one kidney is not the same as having chronic kidney disease."); *Leondi*, 2021 WL 717361, at *3 ("To the extent that Defendant may have limited functioning in one kidney, that is also not the same as chronic kidney disease."); *United States v. Michele*, Crim. No. 13-160, 2020 WL 4676327, at *4 (E.D. La., Aug. 12, 2020) (finding that defendant's medical records did not establish that he suffered any health complications from having only one kidney).

In short, Mr. McPhatter's medical circumstances are in no way extraordinary. In addition, he is at no particular risk of a dangerous COVID infection.

To begin with, medical records reveal that he has been fully vaccinated and boosted. He received the Moderna vaccine on March 24, 2021, April 21, 2021, and January 13, 2022. (G 42, 83)

The vaccines are highly effective at preventing infection and, when

7

breakthrough infections occur, at reducing the severity of symptoms. *See* The Possibility of COVID-19 after Vaccination: Breakthrough Infections, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html; (updated Dec. 17, 2021). The wide availability of vaccines tends to render the COVID-19 risk less extraordinary or compelling. The rates are constantly changing, of course, but the CDC summarizes its effectiveness data as follows:

- **People who were unvaccinated had a greater risk of testing positive for COVID-19 and a greater risk of dying from COVID-19 than people who were fully vaccinated** . . . .
- **Unvaccinated people in all age groups had higher case and death rates than fully vaccinated people in the same age groups.**
- **Case and death rates for people fully vaccinated with any of the three vaccine types (Moderna, Pfizer-BioNTech, Johnson & Johnson's Janssen) were much lower than for unvaccinated people.** https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status

I agree with my colleagues that vaccination, if not always dispositive, is a highly relevant factor. *See generally United States v. Thomas*, No. 21-1645, 2022 WL 296594, at *2 (3d Cir. Feb. 1, 2022) (affirming denial of compassionate release based in part on vaccination, and approvingly citing cases denying compassionate release on basis of refusal to be vaccinated)*; United States v. Jaquwin Marlin,* No. CR 19-168 (SDW), 2021 WL 5711587, at *2 (D.N.J. Dec. 2, 2021) (declining to find extraordinary circumstances where defendant, although at higher risk as a result of obesity, had been vaccinated); *United States v. Dennison,* Crim. No. 09-402 (NLH), 2021 WL 5630296, at *2 (D.N.J. Dec. 1, 2021) (declining to find extraordinary circumstances where defendant had returned positive result for COVID infection and subsequently been vaccinated). I give Mr. McPhatter's vaccinated status great weight in assessing the likelihood that he will suffer a COVID-19 infection, or serious

8

consequences therefrom.[5]

These vaccination-related factors, I find, weigh heavily in the balance against granting compassionate release based on the risk of COVID-19 infection. Where a prisoner is protected by the vaccine, the cases have routinely denied relief despite the existence of such risk factors.

I move on to consider the likelihood of contracting a serious COVID-19 infection in the prison environment of FCI Texarkana. The pandemic caught the prison system, as it caught society, on the back foot, and it took some time to bring cases under control. The prison system instituted extraordinary containment measures, which had some effect. https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp

In 2021, of course, the vaccine became available. Within FCI Texarkana, BOP reports, there have been some 1073 full vaccinations of inmates and 171 of staff. https://www.bop.gov/coronavirus/ The vaccines are highly effective at preventing infection and, when breakthrough infections occur, at reducing the severity of symptoms. *See* The Possibility of COVID-19 after Vaccination: Breakthrough Infections, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html; (updated Dec. 17, 2021). The resulting herd immunity tends to reduce further the risk of infection.

FCI Texarkana is a low-security institution that houses approximately 1116 inmates, including 164 inmates at an adjacent camp facility. https://www.bop.gov/locations/institutions/tex/. Current and cumulative figures for COVID-19 infections are as follows:

| Inmates Positive | Staff Positive | Inmate Deaths | Staff Deaths | Inmates Recovered | Staff Recovered |
| --- | --- | --- | --- | --- | --- |
| 0 | 0 | 2 | 0 | 726 | 153 |

---

[5] Mr. McPhatter vaguely notes that his health has not been the same since he was vaccinated. The medical records do not bear that out. He also self-reports having suffered a COVID infection in January 2021, prior to his vaccination, while incarcerated in Essex County. No ongoing health effects are reported.

9

https://www.bop.gov/coronavirus/ To be sure, these figures, especially the "recovered" figures, reveal that over the past two years there were very significant positive COVID test results among the inmates and staff. Out of some 1116 inmates (not accounting for turnover), there were 2 fatal cases—a rate of approximately .18%.[6] Currently, the institution has no positive cases.

Mr. McPhatter's risk of a COVID-19 infection, and serious consequences therefrom, is high. I do not find that his circumstances are extraordinary and compelling.

### 2. 18 U.S.C. § 3553(a) Factors

Because the circumstances are not extraordinary, I review the factors under 18 U.S.C. § 3553(a) only briefly, but I have considered them all, as I did when sentencing Mr. McPhatter less than two years ago.

The nature of the offense is serious. Mr. McPhatter personally distributed some 100 grams of heroin in a two-week period in May 2017. He acted as a runner for the Johnson DTO, which distributed over 1 kilogram of heroin and 28 grams of cocaine base. The court's ten-year sentence, the minimum required by statute, well served the goals of just punishment, general deterrence, and protection of the public.

Mr. McPhatter's criminal record placed him in Sentencing Guidelines Category IV. Prior convictions that counted in his criminal history score include a 1999 conviction for drug paraphernalia (18 month sentence); aggravated assault and weapons possession (5 year sentence); disorderly conduct (2 years' probation); possession of cocaine (2 years' probation); wandering with intent to sell heroin (18 months' probation). (PSR ¶¶ 104–114) Not all of the crimes were recent. Still, individual deterrence and prevention of further crimes by this defendant remain a concern.

---

[6] Presumably, these were concentrated in the pre-vaccine era, although the cumulative figures do not break down the fatalities by date. The prison population and that of the United States are not comparable demographically, but it is nonetheless instructive to cite the nationwide death rate from COVID-19: approximately 973,000 deaths in a population of 330 million, or about .29%.

10

I recognized and took into account at sentencing difficult circumstances in the defendant's background and his susceptibility to bad influences. I also recognized his expressed desire to participate in programs to overcome his drug problems and change his behavior.

The ten-year sentence imposed was no greater than necessary to fulfill the statutory goals of sentencing, and indeed was statutorily required. Even assuming all good time credit, to grant release at this time would cut four years from that sentence, a reduction that would undermine the goals of sentencing as set forth in 18 U.S.C. § 3553(a).[7]

## ORDER

**IT IS THEREFORE** this 23d day of March, 2022,

**ORDERED** that the petition for compassionate release under the First Step Act (DE 190, 209) is DENIED.

The clerk shall send a copy of this opinion and order to the defendant/petitioner, Mr. McPhatter, by regular first-class mail.

/s/ Kevin McNulty

_____
**KEVIN MCNULTY, U.S.D.J.**

---

[7] The motion, to the extent it may be seeking a transfer to home confinement, must be denied. The Court has no authority to grant such relief, which is reserved to the BOP under 18 U.S.C. § 3624(c)(2). *See United States v. Voda*, 994 F.2d 149, 151–52 (5th Cir. 1993); *Aigebkaen v. Warden*, No. 20-5732, 2020 WL 6883438, at *4 (D.N.J. Nov. 24, 2020) ("Pre-release placement decisions, such as transfers to home confinement, are committed to the BOP's sole discretion.").