**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**Maurice MCPHATTER** | Crim. No. 18-578 (KM)<br><br>**SUPPLEMENTAL<br>OPINION & ORDER** |

**MCNULTY, District Judge**

Before the Court for additional consideration is the motion of the defendant, Maurice McPhatter, for compassionate release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A). (DE 190, as supplemented) Having denied relief, but *sua sponte* appointed counsel and reopened the matter for consideration of additional medical evidence, I now find the case to be a closer one, but nevertheless deny relief. This Opinion should be read in conjunction with my earlier Opinion ("Op." dated March 28, 2022 (DE 217, corrected at DE 218)), to which it is a supplement.

**Background**

The defendant, Maurice McPhatter, is serving a 10-year sentence for drug trafficking. He moved for compassionate release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A), citing the COVID-19 pandemic and the resulting danger to himself while incarcerated, given his other medical conditions. (DE 190, supplemented at DE 209) After review of the medical records and the submissions of the parties, I denied relief, finding that the facts did not meet the necessary threshold of "extraordinary and compelling" circumstances. (*See* Op., DE 217, 218) In particular, I reasoned that Mr. McPhatter had no medical condition that exposed him to particularly severe consequences from COVID if he remained incarcerated, that he had received a

1

COVID vaccination and booster, that current infection rates were very low at his institution, and that the 18 U.S.C. § 3553(a) factors weigh against release.

My decision noted that Mr. McPhatter has only one functioning kidney,[1] and currently has a kidney stone, for which he has refused surgical treatment. While "chronic kidney disease" is a COVID risk factor, I cited prison medical records which did not support that diagnosis:

> A measure of kidney function is the eGFR (i.e., glomerular filtration rate). Prison medical records as of March 2021 report a raw eGFR of 57, with a note to multiply by 1.210 if the subject is African-American, which Mr. McPhatter is. That would yield a calculated eGFR score of 68.97. The same note states that a "calculated GFR <60 suggests a chronic kidney disease if found over a 3 month period." (G050).

(Op. at 6 n.4) In short, Mr. McPhatter's was a borderline case—below 60 as a raw eGFR score, but above 60 if the multiplier for African-American patients is applied.

The 1.210 multiplier applied by the prison medical authorities was well established for purposes of diagnosis and treatment. A month after I filed my decision, however, I read a useful recent New York Times article which noted that there is a shifting medical consensus as to the appropriateness of the multiplier.[2] That article reported that an action had just been filed in the U.S. District Court for the District of Columbia challenging the use of that multiplier by the BOP. A BOP spokesperson reportedly issued a statement to the effect that BOP is in the process of transitioning away from use of the multiplier in the next few months. *Id.*

---

[1]    Appointed counsel, through independent research, has ascertained that Mr. McPhatter's statement that he has only one kidney is inaccurate, though only technically so. He has two kidneys, but one is congenitally malformed and does not function properly. (Def. Brf. 3 n.1)

[2]    *See* https://www.nytimes.com/2022/04/22/nyregion/prison-kidney-federal-courts-race.html?searchResultPosition=1. To be clear, this Court considers the multiplier only as it may affect petitions for compassionate release. The abandonment of the multiplier for diagnosis and treatment is a separate and complex medical issue *See id.* (noting advantages and disadvantages of a higher calculated eGFR score).

I found it appropriate that the parties should be permitted to address the issue of the eGFR multiplier for African-American patients. I therefore *sua sponte* entered the following order:

1. Within 21 days, the parties may file supplemental briefs, not to exceed 15 pages exclusive of exhibits, concerning the effect, if any, of the eGFR multiplier for African-American patients on the Court's prior decision denying compassionate release.

2. The government shall update the defendant's medical records and supply the court and defense counsel with a copy. The briefing may address any relevant changes to the defendant's medical history.

3. The court will appoint counsel to assist the defendant in his presentation.

(Opinion & Order, DE 220 at 3.)[3] Appointed counsel, Timothy M. Donahue, Esq., has now submitted a supplemental brief. ("Def. Brf.", DE 226, as corrected DE 227).[4] The government, too, has submitted a supplemental brief ("Gov't Brf.", DE 224), and updated the defendant's prison medical records (DE 224-1, page-cited as G __).

**Discussion**

### A. Extraordinary and Compelling Circumstances

The legal standards governing a § 3582(c)(1)(A) motion for compassionate relief were thoroughly set forth in my prior opinion, and will not be repeated here. (*See* Op. 1–3.) I reemphasize, however, what is sometimes obscured in discussions of such First Step Act applications: A federal prisoner may be in poor health, and may suffer from ailments that would plague a person whether in or out of prison. One must ask whether there is something about *incarceration* that so *increases* the risk to the prisoner as to set forth

---

[3]     In doing so, I was careful to note that, although the eGFR issue was worthy of discussion, it would not necessarily dictate a different result, even if resolved in defendant's favor. (DE 220)

[4]     The Court thanks Mr. Donahue for his acceptance of the assignment and able advocacy of his client's position.

extraordinary and compelling circumstances justifying his release. I therefore consider the effect of the supplemental submissions and updated information on my prior analysis of (1) the risk, for someone with Mr. McPhatter's medical conditions, that a COVID-19 infection would carry serious consequences; (2) the effect of vaccination on the likelihood of Mr. McPhatter's contracting a serious COVID-19 infection; and (3) COVID-19 infection rates at FCI Texarkana.

### 1. Medical conditions that increase COVID risk

In my prior Opinion, I considered the medical conditions claimed by Mr. McPhatter, and found that they did not rise to the level of extraordinary and compelling circumstances. In particular, I considered that Mr. McPhatter has one functioning kidney, and also that he has kidney stones, for which he has declined surgical treatment.[5] These, I noted, did not establish the existence of "chronic kidney disease," which is listed as a COVID risk factor by the CDC. I also noted that his eGFR score, once the multiplier for African-American patients is applied, did not fall below the threshold for a finding of chronic kidney disease. (Op. 6–7)

Prison medical records, as recently supplemented, reveal that Mr. McPhatter has received regular and appropriate medical care. The most recent figures available show a stable eGFR score of 57 in the period March–June 2021. (G 110, 112) As of April 6, 2022, Mr. McPhatter received a positive diagnosis of chronic kidney disease ("CKD") based on unspecified lab results. (G 90) ("laboratory workup indicates CKD 3a") Consequently, there is no need to decide whether the eGFR multiplier would have been appropriately applied; the actual CKD diagnosis renders that a moot point.

Stage 3a chronic kidney disease ("CKD 3a") corresponds to "mild to moderate loss of kidney function":

---

[5]     The defense does not currently seek release based on kidney stones, but rather on the basis of chronic kidney disease. (Def. Brf. 5.)

## What are the stages of chronic kidney disease (CKD)?

| Stage | Description | eGFR | Kidney Function |
|-------|-------------|------|-----------------|
| 1 | Possible kidney damage (e.g., protein in the urine) with *normal* kidney function | 90 or above | 90-100% |
| 2 | Kidney damage with *mild loss* of kidney function | 60-89 | 60-89% |
| 3a | *Mild to moderate* loss of kidney function | 45-59 | 45-59% |
| 3b | *Moderate to severe* loss of kidney function | 30-44 | 30-44% |
| 4 | *Severe loss* of kidney function | 15-29 | 15-29% |
| 5 | Kidney *failure* | Less than 15 | Less than 15% |

National Kidney Foundation, https://www.kidney.org/atoz/content/gfr. Stage 3a chronic kidney disease, as indicated in the chart, corresponds to an eGFR of 45–59, with no multiplier applied. *See also* Centers for Disease Control, Chronic Kidney Disease, https://nccd.cdc.gov/ckd/help.aspx?section=F#2 ("Stage 3: moderate reduction in kidney function (eGFR 30-59 ml/min per 1.73 m2)"); Def. Brf. 3 ("A score in the range of 45–59 (such as Mr. McPhatter's) is indicative of Stage 3A chronic kidney disease.") Mr. McPhatter's known eGFR readings of 57 fit within the upper part of that range, corroborating the prison medical authorities' diagnosis of "CKD 3a."

Although the defendant does not stress it, the medical records also note that, as of April 6, 2022, Mr. McPhatter has been prescribed Lisinopril (20 mg daily). The associated indication is listed as "Hypertensive heart disease without heart failure." (G 97) His blood pressure was contemporaneously measured as 146/89. (G 96) That level, the most recent and highest measured,

if consistent over time,[6] would indicate the highest level of prehypertension or else hypertension, depending on the guideline employed. *See* https://www.cdc.gov/bloodpressure/about.htm.

As a result, I update the discussion in my prior opinion to reflect that Mr. McPhatter suffers from Stage 3a chronic kidney disease, entailing "mild to moderate" loss of kidney function, and hypertension. Every case is unique, but in general, such chronic conditions, absent strong indications that they would be dangerously aggravated by incarceration, have been regularly rejected as bases for compassionate release.[7]

2. *Effect of vaccination*

As noted in my prior opinion, Mr. McPhatter received the initial does of the Moderna COVID-19 vaccine on March 24, 2021, and booster doses on April 21, 2021 and January 13, 2022. (G 42, 83, 126) I incorporate here that discussion of the vaccine's effectiveness and the case law denying relief to vaccinated prisoners. (Op. at 7–9)

At the time of my prior opinion, FCI Texarkana reported some 1073 full

---

[6] All other measurements were lower. Other readings were 132/83 (2/10/2021) (G33); 129/85 (6/22/2021); 128/80 (2/22/2022); 122/82 (3/22/2022) (all reported at G 114).

[7] *See generally United States v. Pawlowski*, 967 F.3d 327, 329–30 (3d Cir. 2020) (in pre-vaccine era, upholding denial of compassionate release application of inmate who had hypertensive heart disease, COPD, sleep apnea, and only one lung).

The government appropriately cites *United States v. Lawson*, No. 2:11-CR-00103-JRG-2, 2022 WL 1397760, at *2 (E.D. Tenn. May 3, 2022) (denying compassionate relief to 67-year old defendant with stage 3 kidney disease as well as "type 2 diabetes, hypertension, chronic obstructive pulmonary disease (COPD), prostate cancer that is 'recurrent but doing well on rx'"); *United States v. Sims*, No. 2:16 CR 174, 2022 WL 1288592, at *2 (N.D. Ind. Apr. 28, 2022) (denying release to defendant with "stage 3 chronic kidney disease, obstructive sleep apnea, GERD, hypertension, high cholesterol, pre-diabetes, viral hepatitis C (in remission), and obesity" and noting, "The combination of defendant's particular health conditions, the relatively low risk of COVID-19 to defendant given his custodial situation, and the availability of vaccinations leads this court to conclude that extraordinary and compelling reasons do not exist to justify early release in this case"), as well as my own case of *United States v. Darby*, No. CR 13-631 (KM), 2022 WL 1423089, at *4 (D.N.J. May 5, 2022).

vaccinations of inmates and 171 of staff. (Op. at 9) Currently, the figure for inmate vaccinations has increased to 1126, with the staff figure remaining at 171. https://www.bop.gov/coronavirus/ As noted in my prior Opinion, the vaccine has been highly effective, creating a herd immunity that benefits individual inmates such as Mr. McPherson. (Op. at 9–10).

> 3. *Risk of contracting COVID at FCI Texarkana*

I have examined updated COVID figures from FCI Texarkana, which do not alter the analysis. FCI Texarkana, as noted in my prior opinion, is a low-security institution. At that time, it housed approximately 1116 inmates; currently that figure has increased slightly to 1138, including 129 inmates at an adjacent camp facility. https://www.bop.gov/locations/institutions/tex/. Current figures for COVID-19 infections at FCI Texarkana are as follows:

| Inmates Positive | Staff Positive | Inmate Deaths | Staff Deaths | Inmates Recovered | Staff Recovered |
|---|---|---|---|---|---|
| 0 | 0 | 2 | 0 | 692 | 153 |

https://www.bop.gov/coronavirus/ (last visited June 6, 2022). Those figures are substantially the same as those reported in my prior Opinion.[8] Now, as before, I analyze the figures as follows:

> To be sure, these figures, especially the "recovered" figures, reveal that over the past two years there were very significant positive COVID test results among the inmates and staff. Out of some 1116 inmates (not accounting for turnover), there were 2 fatal cases—a rate of approximately .18%.[9] Currently, the institution has no positive cases.

---

[8] The only exception is a reduction in the number of inmates reported "recovered" from 726 to 692.

[9] Presumably, these were concentrated in the pre-vaccine era, although the cumulative figures do not break down the fatalities by date. The prison population and that of the United States are not comparable demographically, but it is nonetheless instructive to compare the nationwide death rate from COVID-19: approximately 1 million deaths in a population of 330 million, or about .3%. *See* https://covid.cdc.gov/covid-data-tracker/#datatracker-home. That is substantially more than the death rate within FCI Texarkana.

(Op. at 10 [fn. updated]). Those infection and death rates, which remain substantially the same, do not establish that Mr. McPhatter is at increased risk of COVID infection while incarcerated, as opposed to in the community at large, and may indeed suggest the opposite.

      *4. Compelling circumstances: Conclusion*

      As noted in my decision reopening the case, a finding of chronic kidney disease would not necessarily entitle this defendant to release. My original decision was based on a number of considerations, most of which are unaffected. Unfortunately, Mr. McPhatter's kidney condition preceded his incarceration and will likely follow him through life. The question is whether, under conditions of incarceration as opposed to in the community at large, he faces an unacceptably increased risk of COVID infection and serious consequences therefrom, given his medical condition, infection rates, and the treatment facilities available in the prison system.

      Mr. McPhatter's relevant medical conditions are quite real and I do not discount them. They are, however, of moderate severity. Nothing about incarceration has been shown to impair Mr. McPhatter's ability to receive medical care or to care for himself; it appears that his various conditions, including ones that are not particular COVID risks, are being appropriately treated and monitored. Mr. McPhatter, as well as most of the prisoners and personnel at FCI Texarkana, are fully vaccinated. The current infection rate at FCI Texarkana is zero, lower than that in the community at large. I therefore do not find extraordinary and compelling circumstances that would justify release to ensure a prisoner's safety.

**B. § 3553 factors**

      Now, as before, I have not found compelling circumstances, but I nevertheless briefly consider in the alternative whether an order of release would undermine the goals of criminal sentencing set forth in 18 U.S.C. § 3553. My prior analysis is incorporated by reference here. (Op. 10–11) Nothing in the supplemental submissions alters my prior conclusion that release at this time would undermine those goals.

The defendant's supplemental submission emphasizes that there were many sympathetic factors in his background, but that the Court's hands were tied by the mandatory 10-year minimum sentence. As defense counsel correctly notes, I stated as much when I imposed that minimum sentence.

Nevertheless, that statutory minimum, *see* 21 U.S.C. § 841(a)(1)(A), no less than 18 U.S.C. § 3553, is a mandatory Congressional statement as to the appropriate sentence to be applied in a case like this one, in which the defendant personally distributed some 100 grams of heroin in a two-week period, and acted as a runner for an organization that distributed over 1 kilogram of heroin and 28 grams of cocaine base. I note also that the defendant's criminal history placed him in Guidelines Category VI, the highest level.

Compassionate release is based on medical factors; it is not an occasion for reconsideration of a sentence as such. The invocation of the general sentencing factors of 18 U.S.C. § 3553(a) is expressed, not as an invitation to resentencing, but as a limitation on compassionate release, even where the circumstances are otherwise compelling. That limitation is not properly employed as a back-door means to express disagreement with Congress's imposition of a mandatory minimum sentence.

Accordingly, I adhere to my prior alternative ruling that even if the circumstances were extraordinary and compelling, release at this time would undermine the goals of sentencing as expressed by Congress.

**ORDER**

**IT IS THEREFORE**, this 7th day of June, 2022,

**ORDERED** that the prior decision of the Court (DE 217, 218), as supplemented herein, is reaffirmed, and the motion for compassionate release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A) (DE 190), is **DENIED**.

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**